**HANSON PLC and The Lowe Group, Plaintiffs,**

v.

**METRO–GOLDWYN–MAYER INC. and Danjaq, Inc., Defendants.**

**No. 96 Civ. 3086 (DC).**

United States District Court, S.D. New York.

July 25, 1996.

Weil, Gotshal & Manges, LLP by Robert G. Sugarman, Katherine J. Daniels, New York City, for Plaintiffs.

O'Donnell, Reeves & Shaeffer, LLP by Pierce O'Donnell, Ann Marie Mortimer, Los Angeles, California, Kaye, Scholer, Fierman, Hays & Handler, LLP by Fredric W. Yerman, Robert Barnes, Jonathan L. Hochman, New York City, for Defendants.

### MEMORANDUM DECISION

CHIN, District Judge.

In this copyright action, plaintiffs Hanson plc ("Hanson") and The Lowe Group ("Lowe") seek a declaration that a television commercial promoting Hanson's corporate image does not infringe upon the copyright in the James Bond character held by Metro–Goldwyn–Mayer Inc. ("MGM") and Danjaq, Inc. ("Danjaq"). MGM and Danjaq have filed a parallel copyright infringement action in the Central District of California. Hanson and Lowe move to enjoin the later-filed California action pursuant to the "first-filed" rule. MGM and Danjaq cross-move to dismiss this action on the ground that the California action is entitled to priority. For the reasons set forth below, the motion of Hanson and Lowe to enjoin prosecution of the California action is denied and the cross-motion of MGM and Danjaq to dismiss this action is granted.

### BACKGROUND

#### A. *The Commercial*

In February 1996, Hanson, a British company with holdings in various businesses, began airing a corporate image television commercial entitled "Sushi Tonight," which features Roger Moore. The commercial was created and produced by Lowe and Partners SMS ("Lowe–New York"), a New York-based division of defendant Lowe, an international advertising agency headquartered in London.

The Sushi Tonight commercial depicts Roger Moore, dressed in a tuxedo, and a beautiful woman handcuffed to a metal stage that is being lowered into a tank of carnivorous fish. The tank is located in the control room of a maniacal villain who is seeking to take over many of the world's industries and create a large commercial empire. Using his teeth, Moore pulls a hairpin from the woman's hair and unlocks his handcuffs. He throws the handcuffs into the machine that is lowering the stage into the tank, stopping its descent. Moore explains to the villain: "Sorry old boy, the people I work for have beat you to it." The villain asks, "What? The Secret Service?" Moore replies, "At my age? Don't be silly. Why, Hanson, of course!" Moore succeeds in destroying the control room and, in the ensuing chaos, the maniacal villain falls into the tank. With the Hanson name appearing on the screen, Moore is seen escorting the woman away from the destruction. The commercial ends as Moore quips: "I wonder what's eating him?"

#### B. *Procedural Facts*

On April 23, 1996, Rebecca L. Ford, Esq., Deputy General Counsel–Litigation at MGM ("Ford"), wrote a letter to George Hempstead, Esq., General Counsel of Hanson Industries, Inc. ("Hempstead"), the holding company for Hanson's United States interests (the "Ford letter"). In her letter, Ford demanded that Hanson cease and desist broadcasting the commercial and that Hanson compensate MGM and Danjaq for the alleged misappropriation of their intellectual property—the rights to the James Bond character.

The Ford letter cited a recent Central District of California case, *Metro–Goldwyn–Mayer Inc. v. American Honda Motor Co.*, 900 F.Supp. 1287 (C.D.Cal.1995), which recognized a likelihood of success on MGM's and Danjaq's claim that they own the copyright in the James Bond character as expressed in various films. The Ford letter also noted that, in the past, MGM and Danjaq had licensed the James Bond character for use in television commercials for substantial fees. Ford expressed the hope that the matter could be amicably resolved, particularly in light of the long relationship among Moore, MGM, and Danjaq and the personal friendship between the respective principals of Hanson and Danjaq. She suggested the possibility of a retroactive license that would

permit Hanson to continue airing the commercial upon mutually acceptable terms. Finally, the Ford letter stated that, although MGM and Danjaq "look[ed] forward to the resolution of this matter, [they] will vigorously enforce [their] rights if no acceptable terms can be reached." (Ford Letter at 3). Ford requested a response to her letter by April 24, 1996.

The following morning, April 24, 1996, Ford spoke to Hempstead by telephone.[1] Hempstead informed Ford that he would not be handling the matter personally, but that he had referred the matter to Graham Dransfield, senior in-house solicitor at Hanson's London office ("Dransfield"). Hempstead asked Ford not to contact Dransfield directly, as she would be hearing from him shortly. In general terms, Ford and Hempstead discussed the preferability of a settlement and the possibility of mediation.

Ford did not hear from Dransfield or anyone else at Hanson. Instead, two days later, on Friday, April 26th, plaintiffs filed the instant action and Hanson's outside counsel, Weil, Gotshal & Manges, faxed Ford a copy of the complaint the same day. The complaint was accompanied by a letter from Weil, Gotshal expressing willingness to discuss settlement and to withdraw the complaint should the parties reach an amicable solution.

The following Monday morning, April 29, 1996, MGM and Danjaq filed their complaint in the Central District of California asserting claims for copyright infringement, violations of the Lanham Act, unfair competition, and tortious interference with prospective business advantage. Hanson and Lowe were served with the complaint in the California action on April 29, 1996. MGM was served with the summons and complaint in the New York action on May 9, 1996 and Danjaq was served on May 21, 1996.

Ford again spoke to Hempstead by telephone on April 29th. Hempstead apologized

for the filing of the complaint in this action, stated that he had not been consulted about the matter, and again expressed an interest in settlement.

These motions followed. I heard argument on July 16, 1996.

## DISCUSSION

In deciding which of two parallel actions should proceed, the general rule in this Circuit is that "the first suit should have priority, absent the showing of balance of convenience in favor of the second action, or unless there are special circumstances which justify giving priority to the second." *Motion Picture Lab. Technicians Local 780, I.A.T.S.E. v. McGregor & Werner, Inc.*, 804 F.2d 16, 19 (2d Cir.1986) (citation omitted); *accord First City Nat'l Bank & Trust Co. v. Simmons*, 878 F.2d 76, 79 (2d Cir.1989); *City of New York v. Exxon Corp.*, 932 F.2d 1020, 1025 (2d Cir.1991) (under the first-filed rule, "where an action is brought in one federal district court and a later action embracing the same issue is brought in another federal court, the first court has jurisdiction to enjoin the prosecution of the second action ... unless there are special circumstances which justify giving priority to the second action") (citations omitted) (internal quotations omitted).

The first-filed rule is not to be applied mechanically, however, but is intended to aid judicial administration by acting "as a 'presumption' that may be rebutted by proof of the desirability of proceeding in the forum of the second-filed action." *Berisford Capital Corp. v. Central States, Southeast and Southwest Areas Pension Fund*, 677 F.Supp. 220, 222 (S.D.N.Y.1988). The party asserting that the first-filed rule should not apply has the burden to show that special circumstances exist justifying departure from the rule. *See 800–Flowers, Inc. v. Intercontinental Florist, Inc.*, 860 F.Supp. 128, 132 (S.D.N.Y.1994).[2]

---

1. Ford submitted a detailed affidavit recounting her conversations with Hempstead. Plaintiffs have not submitted any affidavit from Hempstead to contradict Ford's affidavit.

2. The principal circumstance recognized by courts in this Circuit as warranting departure from the first-filed rule is where the party who filed the first action engaged in forum shopping. *See Motion Picture Laboratory Technicians*, 804 F.2d at 19 ("The chief 'special circumstance' we

I hold, on the basis of the following combination of facts and circumstances, that MGM and Danjaq have shown special circumstances bringing this case within the exception to the first-filed rule. First, Hanson and Lowe filed this declaratory judgment action just three days after MGM sent its cease-and-desist letter. Hence, the declaratory judgment action was filed preemptively and should not be given the benefit of the first-filed rule. *See Factors,* 579 F.2d at 219 ("When the declaratory judgment action has been triggered by a notice letter, this equitable consideration may be a factor in the decision to allow the later filed action to proceed to judgment in the plaintiffs' chosen forum.") (citation omitted); *Mass v. McClenahan,* No. 93 Civ. 3290 (JSM), 1993 WL 267418, at *2 (S.D.N.Y. July 9, 1993) ("[W]here the first-filed case is a declaratory judgment action precipitated by a demand letter and filed in anticipation of the later action, the second-filed action will be permitted to go forward in plaintiff's chosen forum.") (citations omitted).

Second, MGM and Danjaq waited to file suit in reliance upon representations made by counsel for Hanson and Lowe. In her unopposed affidavit, Ford states that "[m]y letter ended with a clear and unambiguous statement that MGM and Danjaq intended to commence litigation if the parties could not reach a prompt settlement." (Ford Aff. at ¶ 4). In their telephone conversation the next morning, Hempstead told Ford she was "sure to be hearing from [Hanson's London counsel] shortly." (Ford. Aff. at ¶ 5). Ford also states that, in response to her suggestion that they consult an attorney to assist in settlement, "Mr. Hempstead advised me to wait until I had heard from Mr. Dransfield." (Ford Aff. at ¶ 6). Outside counsel for MGM has also represented that he had a complaint prepared when the Ford letter was sent. (Hearing Tr. at 16). On these facts, it is clear that MGM and Lowe were lulled into staying their hand by Hempstead's statements. Indeed, in their April 29th conversation, Hempstead "apologized" to Ford for the filing of the instant case on April 26th and told her that "he had been unaware that the New York action was to be filed." (Ford Aff. at ¶ 9).

Third, the two cases were filed only one business day apart: this action was filed on Friday, April 26th and the Central District of California action was filed on Monday, April 29th.[3] When the second action is filed shortly after the first action, courts are less likely to give priority to the first-filed action. *See, e.g., Gibbs & Hill, Inc. v. Harbert Int'l, Inc.,* 745 F.Supp. 993, 996 (S.D.N.Y.1990); *Don King Prods., Inc. v. Douglas,* 735 F.Supp. 522, 532 (S.D.N.Y.1990).

Finally, allowing this action to proceed would discourage potential plaintiffs from initiating settlement discussions prior to filing suit. *See Columbia Pictures Indus., Inc. v. Schneider,* 435 F.Supp. 742, 747–48 (S.D.N.Y. 1977) (although circumstances did not indicate forum shopping where there were substantial ties to New York, court allowed second-filed action to proceed because it was filed only six days after first action and first action was filed in response to settlement demand), *aff'd,* 573 F.2d 1288 (2d Cir.1978); *accord Capitol Records, Inc. v. Optical Recording Corp.,* 810 F.Supp. 1350, 1354–55 (S.D.N.Y.1992) (factors weighing in favor of allowing second-filed action to proceed include: judicial economy, policy in favor of settlement, preventing race to courthouse triggered by demand letter, and fact that second action was filed only twenty days after first action); *Don King Productions,* 735 F.Supp. at 533. Indeed, public policy favors settlement, *see, e.g., Weinberger v. Kendrick,* 698 F.2d 61, 73 (2d Cir.1982), *cert. denied,* 464 U.S. 818, 104 S.Ct. 77, 78

have noted is our interest in discouraging forum shopping."); *Factors Etc., Inc. v. Pro Arts, Inc.,* 579 F.2d 215, 219 (2d Cir.1978), *cert. denied,* 440 U.S. 908, 99 S.Ct. 1215, 59 L.Ed.2d 455 (1979). To some extent, of course, both sides are engaged in forum shopping. For whatever their reasons, Hanson and Lowe prefer to litigate this case in New York while MGM and Danjaq prefer California.

3. MGM and Danjaq also argue that this action is not really the first-filed action because MGM and Danjaq effected service upon Hanson and Lowe first. The date of filing, however, is generally controlling. *See Berisford,* 677 F.Supp. at 222 n. 1.

L.Ed.2d 89 (1983), and potential litigants must be encouraged to seek to avoid litigation rather than to adopt a "sue first, talk later" philosophy.

■ Hanson and Lowe argue that the special circumstances exception is not applicable and that this action should be permitted to proceed because New York is the only convenient forum for trial of this dispute.[4] This contention is rejected. Specifically, Hanson and Lowe contend that the files and witnesses relating to production of the commercial are located either in New York or in Europe, as the commercial was created in New York and filmed in Ireland under the direction of Lowe–New York and Gerard DeThames Films, a London-based production company, and editing was performed in London and New York. For example, Lowe's Creative Director, Copywriter, Art Director, and Producer are all based in New York. These witnesses are expected to testify concerning, *inter alia*, the conception, creation, and production of the commercial. Thus, the evidence regarding copying and scienter is likely to come from New York-based witnesses.

Although Hanson and Lowe do have significant ties to New York, MGM and Danjaq have ties to California that are also likely to be significant to the litigation of this dispute. For example, the evidence regarding ownership of the exclusive right to use the James Bond character is likely to be California-based, as is evidence of damages. Ultimately, however, while I find that the balance of conveniences tips slightly in favor of New York in this case, New York is not the only convenient forum for trial of this dispute and the equities and policy considerations discussed above favor litigating this case in California. *See Continental Ins. Cos. v.*

*Wickes Cos.*, No. 90 Civ. 8215 (KMW), 1991 WL 183771, at *5 (S.D.N.Y. Sept. 6, 1991).

Even though Hanson and Lowe filed this lawsuit first, they did so only in response to MGM's cease-and-desist letter. Hanson and Lowe surely had the right both to reject MGM's offer to discuss settlement and to take an aggressive stance by immediately filing a declaratory judgment action when they received the cease-and-desist letter. They did not have the right, however, to obtain the ability to fire the first salvo by lulling MGM and Danjaq into believing that peace negotiations would precede any litigation. In view of these special circumstances, the case should be litigated in California.

### CONCLUSION

For the reasons set forth above, the motion of Hanson and Lowe to enjoin prosecution of the Central District of California action is hereby denied. The cross-motion of MGM and Danjaq to dismiss this action in deference to the California action is granted. Accordingly, the complaint is dismissed without prejudice to the parties' claims and defenses in the California action.

SO ORDERED.

---

4. Because "[b]alancing factors of convenience is essentially an equitable task," district courts are accorded discretion in determining a suitable forum. *First City*, 878 F.2d at 80; *see William Gluckin & Co. v. International Playtex Corp.*, 407 F.2d 177, 178 (2d Cir.1969); *Berisford*, 677 F.Supp. at 222–23 (factors to be considered include convenience of parties and witnesses, whether nonparty witnesses are subject to subpoena power of court, and availability of docu-mentary evidence) (*citing National Patent Dev. Corp. v. American Hosp. Supply Corp.*, 616 F.Supp. 114, 119 (S.D.N.Y.1984)).

MGM's and Danjaq's California complaint also names as a defendant Southwest Construction Materials & Service, a subsidiary of Hanson that is located in California. As it appears that this entity has no connection to the dispute giving rise to this case, I will not consider this factor in weighing the relative conveniences.